C.D. HARMAN, Plaintiff v. WILLIAM I. BELK, Defendant

No. COA02-1470

(Filed 17 August 2004)

**Libel and Slander— deposition testimony—absolute privilege**

The trial court did not err by reserving its decision on defendant's motion for a directed verdict in a slander case based on deposition testimony and then by denying the motion when renewed by defendant following the jury's verdict in defendant's favor because any error was harmless when the trial court would have been justified in granting defendant's motion for a directed verdict since: (1) a defamatory statement made in due course of a judicial proceeding is absolutely privileged and will not support a civil action for defamation even if it was made with express malice when the statement is sufficiently relevant to the proceeding; (2) the deposition was a judicial proceeding and defendant's statements were made in response to a deposition question by opposing counsel only after defendant balked in answering the question and was directed by both the deposing counsel and his own lawyer to respond; and (3) defendant's statements were not so palpably irrelevant to the subject matter of the controversy that no reasonable man could doubt its irrelevancy or impropriety, thus making the statements absolutely privileged.

Appeal by plaintiff from judgment entered 26 March 2002 and order entered 2 May 2002 by Judge Charles C. Lamm, Jr. in Mecklenburg County Superior Court. Heard in the Court of Appeals 28 August 2003.

> *James, McElroy & Diehl, P.A., by William K. Diehl, Jr. and Preston O. Odom, III, for plaintiff-appellant.*

> *Hedrick, Eatman, Gardner & Kincheloe, L.L.P., by Mel J. Garofalo and M. Duane Jones, for defendant-appellee.*

GEER, Judge.

Plaintiff C.D. Harman appeals a judgment entered on a jury verdict finding that defendant William I. Belk did not slander plaintiff during the course of a deposition in another lawsuit. We hold that any error in the conduct of the trial was harmless because the trial court should have granted defendant's motion for a directed verdict following the close of plaintiff's evidence. The deposition was a judicial proceeding and Belk's comments were not palpably irrelevant to that proceeding. The comments were, therefore, absolutely privileged.

## Factual Background

Defendant Belk was engaged in the business of manufacturing bottled water through a company called Old Well Water, Inc. The company intended to enter into licensing agreements with colleges and universities to permit it to use the schools' logos and market the water on campus and at various other outlets. Old Well entered into a distribution relationship with Collegiate Distributing, Inc., a company formed for that purpose by plaintiff Harman's son, Sayers Harman. The plaintiff in this lawsuit, C.D. Harman ("Harman"), was an officer and director of and a source of financing for Collegiate Distributing.

Ultimately, Old Well Water and Belk sued Collegiate Distributing and Sayers Harman for breach of contract. Collegiate Distributing and Sayers Harman asserted various counterclaims, including breach of contract, unfair and deceptive trade practices, and fraud. They also filed a third-party complaint against William Reed Raynor, another officer of Old Well Water. At the trial of the Old Well lawsuit, the jury found in favor of Collegiate Distributing and Sayers Harman, but awarded only $1.00, which was then trebled to $3.00. They appealed and, in an unpublished opinion, this Court found no error. *Old Well Water, Inc. v. Collegiate Distrib., Inc.*, 150 N.C. App. 717, 565 S.E.2d 112 (2002) (unpublished).

**HARMAN v. BELK**

[165 N.C. App. 819 (2004)]

During the course of the Old Well litigation, counsel for Collegiate Distributing and Sayers Harman deposed Belk. C.D. Harman was present at the deposition. When Belk was asked about a letter he had received from Sayers Harman making certain demands, Belk testified that the letter suggested to him "that [Sayers Harman's] father and he were knaving [sic] on how to figure out at this juncture to sabotage our corporation, and to try to take our agreements and our trademarks." Belk also stated that he believed C.D. Harman had been speaking to Collegiate Licensing and Georgia Tech, possibly in an effort to disrupt Old Well Water's licensing agreements. He indicated that by late summer 1998, he was suspicious of Sayers Harman's and C.D. Harman's intentions toward Old Well Water.

Counsel for Collegiate Distributing and Sayers Harman explored Belk's assertions:

Q. What evidence do you know that Sayers Harman's father, Dale Harman, engaged in any sort of a conspiracy to damage Old Well?

A. We'll let Jack [Belk's counsel] do that on his questioning with Sayers.

Q. Well, I'm asking you what do you know.

[Belk's Counsel]: If you presently have personal knowledge of precisely what Mr. Dale Harman has done testify to that. If you don't, say so, and let's pursue it through other forms of discovery.

A. It's third party.

Q. . . . What third-party information do you have that he has engaged in such activities?

A. Through the other owners of Old Well Water and their employees and family.

Q. And what information is that that you've learned from these third parties?

A. Well, I said it is third party so I'll wait on that.

Q. Well, I'm not going to wait. I want you to answer the question. What do you know?

[Belk's Counsel]: (To witness) Well, he is entitled to ask you if a third party told you something then you have to

HARMAN v. BELK

[165 N.C. App. 819 (2004)]

answer what the third party told you even if it is not of your personal knowledge.

A. There were instances that Sayers told Will Raynor that his father had devised a way to take our inventory. He was coming up there and was not going to pay for it in order to stiff us. He told the warehouse person that he was not—that Sayers was not—told him that he wasn't going to sell our twenty ounce, so that we could not survive. He calls up—personal knowledge—with my distributor up here and spooks them to where they want to—they feel uncomfortable working with us. Cunningham. They are calling up Collegiate Licensing to try to see if they can help revoke our license. Just by the letters and the questions that you are asking. He told my partners that he—that I had put this initial investment but that he was going to get me out and work with them exclusively after I had put up the initial money for a loan. He mislead [sic] us on that—and kept a secret that we did not know. That Will and Elizabeth were his only payroll outside of himself. He misrepresented the fact that he was—had education and competence and business background to set up a distributorship and we—and then kept us away from what he was doing where we didn't even know who the employees were, what he was doing, or anything.

Q. Now, all of those statements you are using pronouns. But do any of those pronouns apply to Dale Harman. And, that was the question, what did Dale Harman do to damage—

A. Dale Harman is the alter ego and he is the one that is behind this whole thing.

Q. Are you saying—

A. Reed Raynor told me pointblank that Dale Harman the first time he [met] him bragged about that he was in some special forces in the Marines and he liked to hurt people, that he broke their knees, and that he was a crud [sic] man. I thought that was kind of strange to hear that from a person that could have been his future father-in-law or I mean outlaw.

. . . .

Q. What exactly did Dale Harman do that you know of or have personal knowledge of someone telling you that he did?

A. I know that this is his money in the corporation. I know that he is an officer and director. I'm pretty positive that he is paying for the lawsuit. I'm pretty positive he has been talking to Collegiate Licensing. And I'm going to find out. Because if he is, he is going to be liable for it. I believe that he is behind this whole scenario. . . .

Q. But, you have no personal knowledge of any of that?

A. This is from what I was told.

. . . .

Q. What did Reed Raynor tell you that Dale Harman specifically did in relation to the things that you have gone on about?

A. As a lawyer he liked to sue the city every year for his taxes and that he liked to blackmail people.

Q. Is that all he told you about Dale Harman?

A. He told me that he bragged all the time when he was with him in social—that he liked hurting people.

Harman filed this action alleging that Belk's statements during this deposition constituted slander *per se*. Defendant Belk filed a motion for summary judgment that was denied on 12 June 2000. The case was tried before a jury beginning 18 March 2002. At the close of plaintiff's evidence and at the close of defendant's evidence, defendant moved for a directed verdict on the grounds of absolute privilege. On each occasion, the trial court reserved ruling. The jury returned a verdict in favor of defendant, finding that defendant did not slander plaintiff. At that point, the trial court denied defendant's motion for a directed verdict and subsequently entered judgment on the jury's verdict on 26 March 2002. Plaintiff filed a motion for a new trial that was denied. Plaintiff has appealed from the judgment and the denial of his motion for a new trial, while defendant has cross-assigned error as to the trial court's denial of the motion for a directed verdict.

On appeal, plaintiff contends: (1) the trial court should have directed a verdict in plaintiff's favor or peremptorily instructed the jury that defendant was liable for slander; (2) the trial court should have instructed the jury that Belk could be held liable for republishing slanderous statements by a third person; and (3) the trial court abused its discretion in denying the motion for a new trial. Defendant, however, contends that the case should never have gone to the jury

because his statements, made in the course of a judicial proceeding, were absolutely privileged.

Our Supreme Court has "consistently held that when, upon a consideration of the whole record, it clearly appears that the appellant, under no aspect of the testimony, is entitled to recover and that the evidence considered in the light most favorable to him is such that the trial judge would have been fully justified in giving a peremptory instruction, or directing a verdict, against him on the determinative issue or issues, *any error committed during the trial will be deemed harmless." Freeman v. Preddy*, 237 N.C. 734, 736, 76 S.E.2d 159, 160 (1953) (emphasis added). We must, therefore, first consider defendant's cross-assignment of error and determine whether the trial court would have been justified in granting defendant's motion for a directed verdict. If we answer that question in the affirmative, then any error argued by plaintiff would be harmless.

Defendant Belk relies upon the rule "that a defamatory statement made in due course of a judicial proceeding is absolutely privileged and will not support a civil action for defamation, even though it be made with express malice." *Jarman v. Offutt*, 239 N.C. 468, 472, 80 S.E.2d 248, 251 (1954) (physician's affidavit regarding plaintiff's insanity absolutely privileged). The public policy underlying this privilege "is grounded upon the proper and efficient administration of justice. Participants in the judicial process must be able to testify or otherwise take part without being hampered by fear of defamation suits." *Houpe v. City of Statesville*, 128 N.C. App. 334, 346, 497 S.E.2d 82, 90 (internal citations omitted), *disc. review denied*, 348 N.C. 72, 505 S.E.2d 871 (1998).

In deciding whether a statement is absolutely privileged, a court must determine (1) whether the statement was made in the course of a judicial proceeding; and (2) whether it was sufficiently relevant to that proceeding. *Harris v. NCNB Nat'l Bank of N.C.*, 85 N.C. App. 669, 672, 355 S.E.2d 838, 841 (1987). These issues are questions of law to be decided by the court. *Scott v. Statesville Plywood & Veneer Co.*, 240 N.C. 73, 76, 81 S.E.2d 146, 149 (1954) ("the question of relevancy or pertinency is a question of law for the courts"); *Harris*, 85 N.C. App. at 674, 355 S.E.2d at 842 (holding that absolute privilege applies to proposed, but unfiled, complaint).

Statements made in a deposition are unquestionably statements made in the course of a judicial proceeding if they meet the relevance requirement. *See* 50 Am. Jur. 2d *Libel and Slander* § 300 (1995) ("The

absolute privilege has been extended to statements made . . . in pretrial deposition and discovery proceedings."). Plaintiff does not contend otherwise. *See also Gibson v. Mutual Life Ins. Co. of N.Y.*, 121 N.C. App. 284, 290-91, 465 S.E.2d 56, 60 (1996) (statements made during a break in a deposition were made in the course of a judicial proceeding); *Rickenbacker v. Coffey*, 103 N.C. App. 352, 357, 405 S.E.2d 585, 588 (statements made by a witness in a pre-deposition conference were absolutely privileged), *disc. review denied*, 330 N.C. 120, 409 S.E.2d 600 (1991).

The primary issue on this appeal is whether Belk's deposition testimony was sufficiently related to the underlying judicial proceeding. Our Supreme Court has held that statements in a judicial proceeding lose the privilege only "if they are not relevant or pertinent to the subject matter of the action, . . . and the matter to which the privilege does not extend must be so palpably irrelevant to the subject matter of the controversy that no reasonable man can doubt its irrelevancy or impropriety." *Scott*, 240 N.C. at 76, 81 S.E.2d at 149. On the other hand, if the statement at issue "is so related to the subject matter of the controversy that it may become the subject of inquiry in the course of the trial, the rule of absolute privilege is controlling." *Id.*

As in *Gibson*, Belk made his statements in response to questions posed by counsel at a deposition. *Gibson*, 121 N.C. App. at 291, 465 S.E.2d at 61 ("[T]he statements meet the relevance requirement as they were made in connection with numerous questions [the witness] was asked during the course of the deposition."). Significantly, under the North Carolina Rules of Civil Procedure, counsel could only ask questions "relevant to the subject matter involved in the pending action[.]" N.C.R. Civ. P. 26(b)(1). *See also* Restatement (Second) of Torts § 588, comment c (1977) ("If the defamatory matter is published in response to a question put to the witness by either counsel or by the judge, that fact is sufficient to bring it within the protection of the privilege, notwithstanding the fact that it is subsequently adjudged to be inadmissible."). Here, Belk's statements were made not only in response to a deposition question by opposing counsel, but also only after he balked in answering the question and was directed by both the deposing counsel and his own lawyer to respond. If Belk's answers were responsive to those questions, they were by definition within the course of a judicial proceeding.

During the deposition of Belk, counsel for Collegiate Distributing and Sayers Harman explored Belk's contention that C.D. Harman and

his son were engaged in a conspiracy to damage Belk's company, Old Well Water. The Old Well litigation appears to have been a battle regarding who breached whose contract and who was trying to undermine whose business. Belk's answers reflect an attempt to explain why he believed that plaintiff Harman was involved in an attempt to undermine Belk's business and was the moving force behind Collegiate Distributing's counterclaims, including what personality traits might motivate Harman to engage in such conduct. While Belk's theories might be dismissed by some, but not all, as dubious, "[t]he fact that the defamatory publication is an unwarranted inference from the alleged or existing facts is not enough to deprive the party of his privilege, if the inference itself has some bearing upon the litigation." Restatement (Second) of Torts § 587, comment c (1977).

Belk's statements were answers to counsel's questions and not "so palpably irrelevant to the subject matter of the controversy that no reasonable man can doubt its irrelevancy or impropriety." *Scott*, 240 N.C. at 76, 81 S.E.2d at 149. They were, therefore, absolutely privileged. This conclusion is necessary given the policies behind the privilege. In years past, courts have struggled with a discovery process hampered by excessive objections and instructions not to answer in the course of depositions. *See, e.g.*, M.D.N.C. R. 26.1(b)(2)(i) ("Counsel shall not direct or request that a witness not answer a question, unless that counsel has objected to the question on the ground that the answer is protected by a privilege or a limitation on evidence directed by the court."). To authorize a slander suit based on deposition testimony that the witness, perhaps mistakenly, felt was responsive to questions he was required to answer would likely cause disruption of depositions in the future and hinder the effectiveness of our civil discovery process. It would not be consistent with the policy of "the proper and efficient administration of justice" underlying the absolute privilege. *Houpe*, 128 N.C. App. at 346, 497 S.E.2d at 90.

Since the statements alleged to be slanderous were made in the course of a judicial proceeding and were sufficiently related to that proceeding, the statements were absolutely privileged. The trial court would, therefore, have been justified in granting defendant's motion for a directed verdict. We need not, therefore, address plaintiff's contentions regarding the conduct of the trial or the denial of his motion for a new trial since any error was harmless. *Freeman*, 237 N.C. at 736, 76 S.E.2d at 160.

In reserving his decision on defendant's motion for a directed verdict and then denying the motion when renewed by defendant following the jury's verdict in defendant's favor, the trial court was following the procedure recommended by the Supreme Court:

> Where the question of granting a directed verdict is a close one, the better practice is for the trial judge to reserve his decision on the motion and allow the case to be submitted to the jury. If the jury returns a verdict in favor of the moving party, no decision on the motion is necessary and an appeal may be avoided.

*Manganello v. Permastone, Inc.*, 291 N.C. 666, 669-70, 231 S.E.2d 678, 680 (1977). Here, when the jury returned a verdict in favor of defendant, it was unnecessary for the trial court to grant defendant's motion for a directed verdict. We, therefore, hold that there was no error.

No error.

Judges McGEE and BRYANT concur.