IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-522

No. COA20-441

Filed 5 October 2021

Guilford County, No. 17 CVS 3273

LOUIS M. BOUVIER, JR., KAREN ANDREA NIEHANS, SAMUEL R. NIEHANS, and JOSEPH D. GOLDEN, Plaintiffs

v.

WILLIAM CLARK PORTER, IV, HOLTZMAN VOGEL JOSEFIAK TORCHINSKY PLLC, STEVE ROBERTS, ERIN CLARK, GABRIELA FALLON, STEVEN SAXE, and the PAT MCCRORY COMMITTEE LEGAL DEFENSE FUND, Defendants

Appeal by Defendants from Order entered 21 December 2019, by Judge R. Allen Baddour, Jr. in Guilford County Superior Court. Heard in the Court of Appeals 24 March 2021.

*Southern Coalition for Social Justice, by Jeffrey Loperfido and Allison J. Riggs, and Womble Bond Dickinson (US) LLP, by Pressly M. Millen and Ripley Rand, for plaintiffs-appellees Louis M. Bouvier, Jr., Karen Andrea Niehans, Samuel R. Niehans, and Joseph D. Golden.*

*Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P., by Gary S. Parsons and Craig D. Schauer, for defendants-appellants Holtzman Vogel Josefiak Torchinsky PLLC, Steve Roberts, Erin Clark, Gabriela Fallon, and Steven Saxe.*

*Blanchard, Miller, Lewis & Isley, P.A., by Philip R. Isley, and Higgins Benjamin, PLLC, by Robert N. Hunter, Jr., for defendant-appellant Pat McCrory Committee Legal Defense Fund.*

*Jewel A. Farlow for defendant-appellant William Clark Porter, IV.*

*Fox Rothschild LLP, by Matthew Nis Leerberg and Zachary Thomas Dawson, for amici curiae Sharad Goel, Marc Meredith, David Rothschild, and Houshmand Shirani-Mehr.*

HAMPSON, Judge.

¶ 1　　This appeal arises from a libel suit filed by Louis Bouvier, Jr. (Bouvier), Karen and Samuel Niehans (the Niehans), and Joseph Golden (Golden) (collectively, Plaintiffs). Plaintiffs' libel suit is premised on allegations that, following the 2016 General Election, defamatory statements, including in election protests filed with their respective County Boards of Elections following the General Election, were made against Plaintiffs falsely accusing Plaintiffs of double-voting. As presently constituted, Plaintiffs' libel suit names: William Clark Porter, IV (Porter), under whose signature one of the election protests was filed; the Pat McCrory Legal Defense Fund (the Defense Fund); and Holtzman Vogel Josefiak Torchinsky PLLC (HVJT) along with HVJT attorneys Steve Roberts, Erin Clark, Gabriela Fallon, and Steven Saxe (HVJT and the HVJT attorneys are collectively referred to as the Law Firm Defendants), who were hired by the Defense Fund and were responsible for preparing the election protests at issue.

¶ 2　　Porter, the Defense Fund, and the Law Firm Defendants (collectively, Defendants) now appeal from a partial Summary Judgment Order entered in favor of Plaintiffs. The trial court's Summary Judgment Order denied Defendants' Motion

for Summary Judgment and granted Plaintiffs' Motion for Summary Judgment as to Defendants' affirmative defenses, and, thus, dismissed Defendants' claimed affirmative defenses of: absolute privilege; qualified privilege; fair report privilege; fair comment privilege; free speech defense; right to petition; immunity based on the Findings of the Guilford County Board of Elections; statutory right to make a protest; and failure to mitigate damages.

¶ 3        In this appeal, Defendants raise a single issue: whether the trial court erred in concluding none of the Defendants was entitled to the protection of absolute privilege from this defamation suit arising from allegations made in the election protests before County Boards of Elections.  Thus, we review only this limited issue and make no determination on the merits of Plaintiffs' underlying libel claim or the availability of any other defenses to Defendants.  Ultimately, we conclude that while Porter—who was a party to a quasi-judicial election protest proceeding—is entitled to absolute privilege, the remaining Defendants—who did not make their allegedly defamatory statements while participating in election protest proceedings in any capacity (e.g., as parties, witnesses, or attorneys), and thus, did not make allegedly defamatory statements in the course of a quasi-judicial proceeding—are not entitled to the defense of absolute privilege.  As a result, we affirm the trial court's Summary Judgment Order in part, reverse it in part, and remand this matter to the trial court

to enter Summary Judgment for Defendant Porter and to conduct further proceedings in the case. The Record before us tends to reflect the following:

**Factual and Procedural Background**

¶ 4        Plaintiffs, registered voters and North Carolina residents, each cast ballots in the 2016 General Election during early voting and did so in their county of residence—Bouvier and the Niehans in Guilford County; and Golden in Brunswick County. The 2016 General Election included a tightly contested gubernatorial race between then-incumbent Governor Pat McCrory and then-challenger Roy Cooper. Vote tallies the morning after the election reflected McCrory trailed Cooper by approximately 5,000 votes.

¶ 5        On 10 November 2016, in the wake of this close election, the McCrory campaign formed the Defense Fund "in preparation for an ongoing legal battle and associated expenses relating to the extended gubernatorial contest." The Defense Fund engaged Jason Torchinsky (Torchinsky) of HVJT to serve as the Defense Fund's counsel. HVJT is a law firm with offices in Virginia and Washington, D.C. A press release announcing the formation of the Defense Fund dated 10 November 2016 identified Torchinsky as "chief legal counsel" for the Defense Fund. Four HVJT lawyers—Defendants Steve Roberts, Erin Clark, Gabriela Fallon, and Steven Saxe— joined Torchinsky in North Carolina to work on the Defense Fund's post-election efforts. On this Record, it does not appear that any of these four lawyers were

licensed or authorized to practice law in North Carolina. As a general proposition, the Law Firm Defendants claim the work they were doing in North Carolina on behalf of the Defense Fund did not constitute legal work or the practice of law. In particular, Attorney Roberts testified in deposition that this was so "[b]ecause [they] were not entering appearances before any judicial bodies."

¶ 6 The Law Firm Defendants, working with Republican National Committee data analysts, compiled a list of names of potential double voters and prepared election protest forms to be filed with County Boards of Elections challenging purportedly ineligible voters. The Defense Fund authorized the Law Firm Defendants to file election protests challenging these allegedly ineligible voters. However, the Defense Fund decided local residents—rather than then-Governor McCrory himself—should file the protests. On 17 November 2016, the McCrory campaign announced protests were being filed in 50 counties "to challenge known instances of votes being cast by dead people, felons or individuals who voted more than once[,]" seeking "to void anywhere between 100 to 200 ballots . . . ." These included the election protests at issue in this case alleging Plaintiffs each voted more than once in the 2016 General Election.

¶ 7 Attorney Roberts was charged with preparing the election protest forms to be filed in Guilford County, which included allegations against Bouvier and the Niehans. One such protest identified Bouvier and the Niehans as "persons known to have voted

in multiple states" (Guilford County Protest). When asked what specific data he relied on that indicated these three Plaintiffs had voted in another state, Attorney Roberts testified:

> The specific data was that they appeared on a list produced by a data analyst who had run whatever processes on the data that were enough to satisfy [the analyst] and Jason Torchinsky, that there was enough . . . for him to reasonably believe those individuals . . . had voted in more than one jurisdiction in the same election.

When asked if he knew upon what data the analyst relied, Attorney Roberts testified: "I would have no reason to understand a dataset that I was looking at, so no."

¶ 8      Meanwhile, the Defense Fund identified Porter as a potential volunteer to file the Guilford County Protest. During a phone call from Attorney Roberts to Porter, Porter asked Attorney Roberts whether the protest was "frivolous, because [he] didn't want to attach [his] name to anything regardless of what it was if it was just frivolous[,]" to which Attorney Roberts replied, "no, it had meat." Following the conversation, Porter permitted Attorney Roberts via e-mail to sign the Guilford County Protest on his behalf. Attorney Roberts testified in preparing and filing the Guilford County Protest he did not engage in the practice of law or legal work on behalf of the Defense Fund. He also testified in filing the Protest he was not acting either as Porter's attorney or as Porter's "attorney in fact."

¶ 9        As far as Porter's knowledge of the allegations in the Guilford County Protest,

when asked during his deposition whether he had heard of the individuals accused of

double voting in the Protest, Porter replied:

> A. To the best of my knowledge, no.
>
> . . . .
>
> Q. What was the basis of accusing Karen Andrea Niehans of casting an invalid ballot and having voted in another state?
> A. What's the basis? Attorney Steve Roberts.
> Q. What Roberts told you?
> A. Yes.
> Q. Did Roberts tell you anything specifically about her?
> A. Not that I recall. He may not even -- he may not have mentioned her name specifically.
> Q. Okay. Do you personally have any basis for stating that she was, quote, known to have voted in multiple states?
> A. Other than maybe what Attorney Roberts stated.
> Q. Well, I understand you might have been told something by somebody else, but my question is do you have personal knowledge ---
> A. --- I do not have any in-hand [sic] knowledge.
> Q. Did you witness any misconduct on the part of Ms. Niehans?
> A. To the best of my knowledge, no.
> Q. Okay. The same questions regarding Samuel R. Niehans. What was the basis of accusing Samuel R. Niehans of casting an invalid ballot and having voted in another state?
> A. Here, again, I -- to the best of my knowledge, I'm not even sure if their names were mentioned.
>
> . . . .
>
> Q. All right. Do you have any personal knowledge that he was known to have voted in a state other than North Carolina?
> A. Not directly, no, other than what Attorney Roberts told me.

. . . .

Q. Okay. Did you witness any misconduct on the part of Mr. Niehans?

A. Obviously to the best of my knowledge, no.

Q. Okay. What was the basis of accusing Louis Maurice Bouvier, Jr. of casting a[n] invalid ballot and having voted in another state?

A. The same answer would apply from what you just asked, and with Attorney Steve Roberts.

Q. Do you have any recollection of a discussion specifically about Mr. Bouvier?

A. No.

Q. Do you have any personal basis for stating that he was known to have voted in more than one state?

A. I don't have any personal [sic] other than what Attorney Steve Roberts told me.

Q. Did you witness any misconduct on the part of Mr. Bouvier?

A. To the best of my knowledge, no.

¶ 10 The Guilford County Protest, filed on 17 November 2016, contained the following language:

5. Does this protest involve an alleged error in vote count or tabulation? If so, please explain in detail.

Upon review of early voting files from other states, it appears that nine (9) individuals cast ballots in both North Carolina and another state. Casting a ballot in more than one state is a clear violation of North Carolina and federal election laws. Therefore, these ballots were erroneously counted and tabulated by the GUILFORD County Board of Elections.

. . . .

8. Please provide the names, addresses, and phone numbers of any witnesses to any misconduct alleged by you in this protest, and specify what each witness listed saw or knows.

> William Porter
>
> . . . .
>
> Based on a review of the public records described in section 5 above, I allege as described herein.
>
> . . . .
>
> 10. Do you contend the allegations set out by you are sufficient to have affected or cast doubt upon the results of the protested election? If you answer is yes, please state the factual basis for your opinion.
>
> Yes. The described allegations clearly demonstrate that ballots cast by persons who voted in multiple states, for the election held on November 8, 2016 in GUILFORD County, are invalid under State law. The invalid ballots cast by persons who have voted in multiple states in violation of state and federal law, must not be counted for any office voted.

¶ 11 The first time Porter saw the Guilford County Protest itself was at his deposition. Prior to a 21 November 2016 hearing before the Guilford County Board of Elections, Porter tried contacting Attorney Roberts, but Attorney Roberts did not answer. While Porter expected Attorney Roberts or a colleague to appear at the hearing, nobody appeared to represent him. The Guilford County Board of Elections dismissed the protest against Bouvier and the Niehans for "lack of any evidence presented[.]"

¶ 12 Separately, Attorney Clark drafted an election protest form, to be filed in Brunswick County (Brunswick County Protest), which alleged Golden, among others,

had voted twice. Thereafter, Joseph Agovino (Agovino) received a call "from somebody from the state committee or somebody from McCrory's campaign . . . who indicated that they had identified a case of voter fraud of somebody who ha[d] lived in this area who came from another jurisdiction and voted twice." The caller asked Agovino "if [he] would be willing to, you know, make a complaint against an individual[.]" Agovino recalled during his deposition:

> They gave me the name of [Golden]. They told me where he lived and told me how to file or, you know, number one, they asked me would I be interested in filing or please file, you know. It was one of those things they said it was part of my -- you know, I should be doing this as the chairperson. I remember asking, "You definitely have evidence of this?" And they said yes. And I said -- you know, I wanted to make sure they had evidence of this, and they said yes.

Agovino advised the caller: " 'As long as you can prove it, I would be more than willing to' -- you know, not more than willing but I would be willing to do it." Attorney Clark provided a completed election protest form to Agovino, who signed it. The Protest was then filed with the Brunswick County Board of Elections. Attorney Clark later testified Agovino was not her client.

¶ 13    When asked during his deposition whether he reviewed any files with respect to Golden's alleged voting, Agovino replied:

> A. Personally? No.
> Q. Did you review any voter files from this state before the protest was filed?
> A. No, I did not.

> Q. Okay. But on November 17th when the protest was filed, did you believe that Mr. Golden had voted in two states?
> A. Yes, I did.
> Q. And why is that?
> A. Because of the conversations and so-called evidence that I was supposed to have received that he had voted in two places.
> Q. And you did ask to review the voting files before the protest was filed?
> A. I asked for evidence. I did not ask to review specific voting files, no. I assumed that's what she was going to get me and so that never came.

The Brunswick County Protest contained the following:

> 5. Does this protest involve an alleged error in vote count or tabulation? If so, please explain in detail.
>
> Upon review of early voting files from other states, it appears that one (1) individual cast ballots in both North Carolina and another state. Casting a ballot in more than one state is a clear violation of North Carolina and federal election laws. Therefore, these ballots were erroneously counted and tabulated by the BRUNSWICK County Board of Elections.
>
> . . . .
>
> 8. Please provide the names, addresses, and phone numbers of any witnesses to any misconduct alleged by you in this protest, and specify what each witness listed saw or knows.
>
> Joe Agovino, . . . early voting files from other states[.]
>
> . . . .
>
> 10. Do you contend the allegations set out by you are sufficient to have affected or cast doubt upon the results of the protested election? If your answer is yes, please state the factual basis for your opinion.

Yes. The described allegations clearly demonstrate that ballots cast by persons who voted in multiple states, for the election held on November 8, 2016 in BRUNSWICK County, are invalid under State law. The invalid ballots cast by persons who have voted in multiple states in violation of state and federal law, must not be counted for any office voted.

¶ 14     Regarding the filing of the Brunswick County Protest, Clark was asked the following:

> **Q.** Section eight of this protest says please provide the names, addresses and phone numbers of any witnesses to any misconduct alleged by you in this protest. Do you see that?
> **A.** Yes.
> **Q.** You listed Mr. Agovino's name here, is that correct?
> **A.** Yes.
> **Q.** That was false because Mr. Agovino in fact wasn't a witness to any misconduct was he?
> **A.** I guess not.
> **Q.** So it was false?
> **A.** Yes.
>
> . . . .
>
> **Q.** Was the fact of Mr. Golden's alleged multiple voting known to Mr. Agovino -- the person who signed the protest?
> **A.** Yes.
> **Q.** How was it known to him?
> **A.** I guess it wasn't known. This was the wording drafted by whoever wrote the election protest . . . .
> **Q.** When you filled this out you said that it was known that Mr. Golden had voted in multiple states, right?
> **A.** Yes.
>
> . . . .
>
> **Q.** It wasn't known by Mr. Agovino, the person who signed the protest, right?
> **A.** Yes.

¶ 15    After filing the Brunswick County Protest, Agovino kept in touch with the director of the Board of Elections, who, in turn, "checked with the county in which [Golden] was supposed to have resided in the other state . . . ." The director then got back to Agovino informing him "there was no evidence that [Golden] voted in that county, absentee or otherwise." Agovino then "called the state party." "They put me in touch with the campaign because that's who was running it and stuff. The attorney said that she was going to get back to me." A week later, Agovino learned "all the attorneys essentially went back to where they came from" and the attorney with whom he had been in contact "was from out of state[.]" "[S]omeone else said that, you know, they'll get back to me. They never got back to me." On 22 November 2016, Agovino withdrew the protest. "I was a little upset then[,]" he recalled. "They left me hanging down there[.]"

¶ 16    On 8 February 2017, Plaintiffs filed an action for libel against Porter, and on 9 November 2017 filed an Amended Complaint adding the Law Firm Defendants and the Defense Fund.[1] In the Amended Complaint, Plaintiffs also added a claim for civil conspiracy against all Defendants and requested a class action certification. The same day, the case was designated as exceptional under Rule 2.1 of the General Rules

---

[1] The original Complaint included Gabriel Arthur Thabet as a Plaintiff. Thabet filed a Notice of Voluntary Dismissal on 10 July 2017 and was not a party to the Amended Complaint.

of Practice for the Superior and District Courts. On 6 June 2018, the trial court granted Defendants' Motion to Dismiss Plaintiffs' proposed class certification and denied it as to Plaintiffs' remaining claims alleged in the Amended Complaint.

¶ 17 On 3 September 2019, Defendants jointly moved for Summary Judgment on all claims asserted by Plaintiffs. On the same day, Plaintiffs moved for Summary Judgment on all Defendants' affirmative defenses, including, among others, the defense of absolute privilege. After a 20 November 2019 hearing, the trial court entered its Order denying Defendants' Motion, granting Plaintiffs' Motion, and dismissing Defendants' affirmative defenses. On 17 January 2020, Defendants timely filed a written Notice of Appeal.

## Appellate Jurisdiction

¶ 18 As Defendants acknowledge, the trial court's Order denying Defendants' Motion for Summary Judgment and granting Plaintiffs partial Summary Judgment is interlocutory in nature in that it leaves pending Plaintiffs' claims against Defendants. *See Veazey v. City of Durham*, 231 N.C. 357, 362, 57 S.E.2d 377, 381 (1950) ("An interlocutory order is one made during the pendency of an action, which does not dispose of the case, but leaves it for further action by the trial court in order to settle and determine the entire controversy." (citation omitted)). Defendants, however, argue this Court has appellate jurisdiction over this appeal under N.C. Gen. Stat. §§ 1-277(a) and 7A-27(b)(3)(a) because the trial court's Order rejecting their

invocation of the absolute privilege defense affects a substantial right which would be lost absent an immediate appeal.

¶ 19 Indeed, in *Topping v. Myers*, this Court analogized the absolute privilege defense to a defense of sovereign or public official immunity and recognized: "[i]f an absolute bar to suit extends and applies to [d]efendants' actions, the trial court's failure to dismiss [p]laintiff's claims deprives [d]efendants of immunity from suit[.]" 270 N.C. App. 613, 617, 842 S.E.2d 95, 99 (2020), *appeal dismissed, review denied*, 854 S.E.2d 800 (N.C. 2021). "If applicable, this denial of immunity from suit, as asserted in Defendants' motion, is a substantial right for Defendants, which would be lost, absent interlocutory review." *Id.* (citation omitted). In *Topping*, we conducted a full analysis of the merits to determine whether to dismiss the appeal as interlocutory. *Id.* We ultimately determined statements at issue in that case made during an "out-of-court press conference during pending litigation are too far afield to be considered 'made in due course of a judicial proceeding' " to justify invocation of the absolute privilege against defamation suits. *Id.* at 628, 842 S.E.2d at 106 (citation omitted). As such, there we dismissed the appeal as interlocutory. *Id.*

¶ 20 Turning to this case, "[i]t is usually necessary to resolve the question in each case by considering the particular facts of that case and the procedural context in which the order from which appeal is sought was entered." *Waters v. Qualified Personnel, Inc.*, 294 N.C. 200, 208, 240 S.E.2d 338, 343 (1978). "Whether an

interlocutory appeal affects a substantial right is determined on a case-by-case basis." *Grant v. High Point Reg'l Health Sys.*, 172 N.C. App. 852, 853, 616 S.E.2d 688, 689 (2005) (citation omitted).

¶ 21      Here, unlike in *Topping*, Defendants' claim of absolute privilege does not arise from an out-of-court press conference, but rather rests on Defendants' contention their allegedly defamatory statements were made in the course of election protests, which Defendants maintain were quasi-judicial proceedings, to which the absolute privilege is applicable. Thus, on the facts of this case, we conclude—to the extent the trial court's Summary Judgment Order dismissed Defendants' absolute privilege defense and declined to grant Summary Judgment to Defendants on this defense— Defendants have established that the trial court's Order affects a substantial right, which may be lost absent immediate review. Therefore, this Court has appellate jurisdiction pursuant to N.C. Gen. Stat. §§ 1-277(a) and 7A-27(b)(3)(a) to consider the merits of this otherwise interlocutory appeal.[2] N.C. Gen. Stat. § 1-277(a) (2019); § 7A-27(b)(3)(a).

---

[2] Defendants have also filed, in the alternative, a Petition for Writ of Certiorari requesting we review the merits of their case in the event we determine Defendants have no right of immediate appeal. Resting on our conclusion the Order appealed from affects a substantial right and, thus, immediate appeal of this issue is permitted, we dismiss the Petition for Writ of Certiorari as moot.

## Issues

The key issues for decision are whether: (I) the election protests at issue in this case constituted quasi-judicial proceedings to which the absolute privilege against defamation suits may apply; and (II) the absolute privilege applies to bar this libel action against any of the Defendants in this case.

## Analysis

"Our standard of review of an appeal from summary judgment is de novo; such judgment is appropriate only when the record shows that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." *Hidalgo v. Erosion Control Servs., Inc.*, 272 N.C. App. 468, 471, 847 S.E.2d 53, 55 (2020) (quotation marks omitted) (quoting *In re Will of Jones*, 362 N.C. 569, 573, 669 S.E.2d 572, 576 (2008)).  Likewise, we apply de novo review to a trial court's conclusions on the applicability of absolute privilege.  *Topping*, 270 N.C. App. at 619, 842 S.E.2d at 100-01.

I.    Applicability of Absolute Privilege to Election Protest Proceedings

Our analysis begins with two threshold matters.  The first is the applicability of absolute privilege to statements made in the due course of an election protest generally.  The second is Plaintiffs' contention statements made in the course of these specific election protests should not be afforded absolute privilege because Defendants' challenges to individual voters were improperly brought as election

protests and not based on the conduct of the election as a whole, and were thereby irrelevant to an election protest proceeding.

¶ 25    "The general rule is that a defamatory statement made in the due course of a judicial proceeding is absolutely privileged and will not support a civil action for defamation, even though it be made with express malice." *Jarman v. Offutt*, 239 N.C. 468, 472, 80 S.E.2d 248, 251 (1954) (citation omitted). "Our courts have held that statements are 'made in due course of a judicial proceeding' if they are submitted to the court presiding over litigation or to the government agency presiding over an administrative hearing and are relevant or pertinent to the litigation or hearing." *Burton v. NCNB Nat'l Bank of N.C.*, 85 N.C. App. 702, 705, 355 S.E.2d 800, 802 (1987) (citations omitted). To determine whether an allegedly defamatory statement was made in the due course of a judicial proceeding, our courts have, therefore, applied a two-step analysis: "[i]n deciding whether a statement is absolutely privileged, a court must determine (1) whether the statement was made in the course of a judicial proceeding; and (2) whether it was sufficiently relevant to that proceeding." *Harman v. Belk*, 165 N.C. App. 819, 824, 600 S.E.2d 43, 47 (2004) (citation omitted).

¶ 26    As to the question of the applicability of absolute privilege to election protests generally: "[t]he phrase 'judicial proceeding' in the context of absolute privilege . . . encompasses quasi-judicial proceedings." *Topping*, 270 N.C. App. at 625, 842 S.E.2d at 104 (citation omitted); *see also Angel v. Ward*, 43 N.C. App. 288, 293, 258 S.E.2d

788, 792 (1979) ("The privilege attending communications made in the course of judicial proceedings has been extended to protect communications in an administrative proceeding only where the administrative officer or agency in the proceeding in question is exercising a judicial or quasi-judicial function." (citation omitted)).

¶ 27 Here, the election protests were filed with the respective County Boards of Elections under the alleged authority of N.C. Gen. Stat. § 163-182.9 in existence in 2016[3] and utilizing the form promulgated by the State Board of Elections. Our Supreme Court has recognized the State Board of Elections acts as a quasi-judicial body in the context of considering protests concerning the conduct of an election. *Ponder v. Joslin*, 262 N.C. 496, 501, 138 S.E.2d 143, 147 (1964) ("The State Board of Elections is a quasi-judicial agency and may . . . investigate alleged frauds and irregularities in elections in any county upon appeal from a county board or upon a protest filed in apt time with the State Board of Elections[.]"). Moreover, our Court has also previously approved a definition of "quasi-judicial" in the absolute privilege context as: "[a] term applied to the action, discretion, etc., of public administrative officers, who are required to investigate facts, or ascertain the existence of facts, and

---

[3] In 2017, these statutes were recodified by S.L. 2017-6. In 2018, S.L. 2017-6 was repealed effective 31 January 2019 by S.L. 2018-146. Thus, the current statutes are apparently in-line with the statutes in effect following the 2016 election.

draw conclusions from them, as a basis for their official action, and to exercise discretion of a judicial nature." *Angel*, 43 N.C. App. at 293, 258 S.E.2d at 792 (quotation marks omitted; alteration in original) (quoting Black's Law Dictionary 1411 (4th ed. rev. 1968)). By statute, a County Board of Elections considering an election protest must: (a) ascertain whether there is probable cause for the protest; (b) provide notice of hearing of the protest; (c) conduct some form of evidentiary hearing which must be recorded; and (d) make findings of fact and conclusions of law based on the evidence presented. N.C. Gen. Stat. § 163-182.10 (2016).

¶ 28    Thus, election protest proceedings before County Boards of Elections fall squarely in the category of quasi-judicial proceedings. *Cf. Rotruck v. Guilford Cnty. Bd. of Elections*, 267 N.C. App. 260, 264, 833 S.E.2d 345, 349 (2019) (stating a County Board of Elections sits as a quasi-judicial body in reviewing a voter registration challenge); *Knight v. Higgs*, 189 N.C. App. 696, 699, 659 S.E.2d 742, 745 (2008) (stating a County Board of Elections sits as a quasi-judicial body in deciding to remove a voter from rolls). Therefore, statements made or submitted to a County Board of Elections in an election protest are statements made in the course of a quasi-judicial proceeding. Consequently, as a general principle, absolute privilege applies to defamatory statements made in the course of an election protest filed with a County Board of Elections.

¶ 29        Next, Plaintiffs argue, however, the allegedly defamatory statements contained in the election protests made by Defendants were so far outside the bounds of the proper scope of an election protest proceeding to render the statements insufficiently relevant or pertinent to the election protest proceeding. Plaintiffs contend the election protests in this case, in fact, merely disputed the eligibility of individual voters and, thus, should properly be classified as untimely voter challenges and not election protests. Plaintiffs specifically assert a proper election protest, as defined in N.C. Gen. Stat. § 163-182(4), is one which relates to the overall "conduct of the election." Rather, Plaintiffs claim the protests filed across the state at the behest of the Defense Fund challenging the eligibility of individual voters actually constituted voter challenges under N.C. Gen. Stat. §§ 163-84 and 163-87, which were required to be made on or before Election Day. Indeed, Plaintiffs note, during the course of the election protests filed on behalf of the McCrory campaign following the 2016 General Election, the State Board of Elections issued its own determination making this distinction and administratively ruling County Boards of Elections "shall dismiss a protest of election that merely disputes the eligibility of a voter" unless it was a timely-filed voter challenge or, in fact, there were sufficient ineligible votes cast to potentially impact the outcome of an election.

¶ 30        Defendants here were aware at the time the protests were filed challenging individual voters that those protests—even if they all had merit—would not have

impacted the outcome of the election. Nevertheless, Defendants, pointing to cases from other jurisdictions, argue that, even though the election protests filed in Guilford and Brunswick Counties were meritless, absolute privilege should still apply. *See, e.g., Mixter v. Farmer*, 215 Md. App. 536 (slip op. at *6), 81 A.3d 631, 635 (2013) ("[U]nder Maryland law, even a meritless complaint is privileged and the complainant's motive is immaterial." (citation omitted)); *Barker v. Huang*, 610 A.2d 1341, 1345-46 (Del. 1992) ("We therefore hold that no 'sham litigation' exception to the defense of absolute privilege exists under the law of Delaware.").

¶ 31        For purposes of determining whether the absolute privilege applies to the election protest filings at issue in this case, however, it is unnecessary to resolve the question of whether those filings were valid election protests. Applying North Carolina law, "the matter to which the privilege does not extend must be so palpably irrelevant to the subject matter of the controversy that no reasonable man can doubt its irrelevancy or impropriety." *Jones v. Coward*, 193 N.C. App. 231, 233, 666 S.E.2d 877, 879 (2008) (quoting *Scott v. Statesville Plywood & Veneer Co.*, 240 N.C. 73, 76, 81 S.E.2d 146, 149 (1954)). "If it is so related to the subject matter of the controversy that it may become the subject of inquiry in the course of the trial, the rule of absolute privilege is controlling." *Scott*, 240 N.C. at 76, 81 S.E.2d at 149.

¶ 32        Here, even absent any indication that the ultimately disproven allegations of individual voter irregularities in this case would have altered the outcome of the

election, for purposes of applying absolute privilege, however, they were at least related to the subject matter of the controversy such that they may have "become the subject of inquiry in the course" of the administrative hearing. *See id.* Certainly, we cannot conclude they were so "palpably irrelevant" to an election protest that "no reasonable man [could] doubt [their] irrelevancy or impropriety." *See id.* This is underscored by the fact the State Board of Elections issued its determination concluding individual voter challenges not impacting the outcome of an election were not properly brought as election protests only after—and in light of—the filing of these and other protest forms at the behest of the Defense Fund and the McCrory campaign. Consequently, on the Record and facts before us, absolute privilege applies to the election protests containing the allegedly defamatory statements in this case.

II.     Applicability of Absolute Privilege to Defendants

Having determined absolute privilege applies to election protest proceedings before County Boards of Elections and to the putative election protests at issue in this case, the question becomes whether Defendants are entitled to the protection of the absolute privilege for the allegedly defamatory statements made here. Application of the absolute privilege here merits separate analyses for (A) Porter, (B) the Law Firm Defendants, and (C) the Defense Fund. We address each in turn.

*A.     Porter*

"The public policy underlying this privilege is grounded upon the proper and

efficient administration of justice. Participants in the judicial process must be able to testify or otherwise take part without being hampered by fear of defamation suits." *Harman*, 165 N.C. App. at 824, 600 S.E.2d at 47 (citation and quotation marks omitted). Consistent with this public policy, our Courts have then recognized the absolute privilege applies to statements by participants in judicial and quasi-judicial proceedings made within the scope of those proceedings. For example, this Court has noted:

> The scope of the accompanying absolute privilege has been held to include not only statements made by judge, counsel and witnesses at trial, but also statements made in pleadings and other papers filed in the proceeding, out-of-court affidavits or reports submitted to the court and pertinent to the proceedings, communications in administrative proceedings where the officer or agency involved is exercising a quasi-judicial function, and out-of-court statements between parties to a judicial proceeding, or their attorneys, relevant to the proceedings.

*Harris v. NCNB Nat'l Bank of N.C.*, 85 N.C. App. 669, 673, 355 S.E.2d 838, 842 (1987).

¶ 35 In this regard then, absolute privilege most clearly applies to Defendant Porter. Porter was the actual protestor in the Guilford County Protest filed against Bouvier and the Niehans. The allegedly defamatory statements made by Porter were those adopted by him and made on the protest form filed with the Guilford County Board of Elections upon which he authorized his signature as a party. *See id.* at 674, 355 S.E.2d at 842 ("The absolute privilege extends to parties to the litigation."). Thus, Porter is entitled to the protection of absolute privilege from suit in this case.

Therefore, the trial court erred in denying Summary Judgment for Porter and granting partial Summary Judgment for Plaintiffs on his defense of absolute privilege.

### B.   Law Firm Defendants

¶ 36        For their part, the Law Firm Defendants advocate for a broad application of the absolute privilege. Specifically, the Law Firm Defendants argue—largely in the passive voice—that because their allegedly defamatory statements were included in election protest forms filed with the respective County Boards of Elections, they necessarily benefit from the absolute privilege. The Law Firm Defendants further assert that this is so even though they were not "participants" in the election protest proceedings, going so far as to argue there is no requirement that one be a "participant" in a legal proceeding to receive the benefit of the absolute privilege against a defamation suit based upon statements made in the due course of a legal proceeding.

¶ 37        Our analysis of this issue folds back into the question of whether the allegedly defamatory statements made by the Law Firm Defendants in this case were made in the course of a legal proceeding. Indeed, in *Topping*, our Court recently concluded participants in a lawsuit were not entitled to absolute immunity for allegedly defamatory statements made outside of their actual participation in the lawsuit. *Topping*, 270 N.C. App. at 624, 842 S.E.2d at 104. In that case, we declined to extend

absolute privilege to a party's attorneys for statements made at an "out-of-court press conference[] during pending litigation." *Id.* (citation omitted). In fact, our Court reasoned even defamatory statements that " 'mirror' allegations made in a filed complaint[] deviate from and stray too far beyond the core and 'occasion' of speech to invoke immunity from suit." *Id.* at 624, 842 S.E.2d at 103. "Such immunity cannot be justified by asserted public interest beyond encouraging frankness and protecting testimony, communications between counsel *inter se* or with the court, and participation within the judicial proceeding." *Id.* at 624, 842 S.E.2d at 103-04.

¶ 38 Our decision in *Topping* provides guidance in this case. *Topping* acknowledged the general policy behind absolute privilege is to protect "[p]articipants in the judicial process" such that they may be able to "testify or otherwise take part without being hampered by fear of defamation suits." *Id.* at 624, 842 S.E.2d at 103 (quotation marks omitted) (quoting *Jones*, 193 N.C. App. at 234, 666 S.E.2d at 879). This Court, in turn, reaffirmed "an attorney at law is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as a part of, a judicial proceeding in which he participates as counsel, if it has some relation to the proceeding." *Id.* at 620, 842 S.E.2d at 101 (quotation marks omitted) (quoting *Jones*, 193 N.C. App. at 234, 666 S.E.2d at 879 (quoting Restatement (Second) of Torts § 586 (1977))).

¶ 39        As such, even when attorneys are participants in a judicial proceeding, the absolute privilege only extends to statements made during the course of their participation in (or in preliminary matters related to) those proceedings. *Id.* Thus, absolute privilege does not apply to allegedly defamatory statements made by an attorney when they are not participating in the judicial proceeding. *See id.; see also Oparaugo v. Watts*, 884 A.2d 63, 81 (D.C. 2005) ("Thus, merely acting as an attorney is insufficient; the attorney must participate as counsel in the relevant proceeding.").

¶ 40        In this case, the Law Firm Defendants have disclaimed acting as attorneys for the protestors in the election protest proceedings. They did not appear at the hearings before the Guilford and Brunswick County Boards of Elections on the protests. In fact, it does not appear the Law Firm Defendants were licensed or authorized to practice law in North Carolina at the time the election protests were filed. As such, the allegedly defamatory statements attributed to the Law Firm Defendants were not made while they were participating as counsel in the election protest proceeding.

¶ 41        On appeal, the Law Firm Defendants, however, argue that even if they were not acting as counsel for the protestors, they were nevertheless participating in the election protest proceedings because they were acting as Porter's and Agovino's "agents" in drafting and filing the protests with the County Boards of Elections, thereby initiating the quasi-judicial proceedings. To the extent there is a distinction

here between the Law Firm Defendants acting as attorneys for the protestors or merely as their "agents" in drafting and filing documents initiating quasi-judicial proceedings, it is one without a difference. *See Topping*, 270 N.C. App. at 622, 842 S.E.2d at 102 ("Where the relation of attorney and client exists, the law of principal and agent is generally applicable." (quotation marks omitted) (quoting *Bank v. McEwen*, 160 N.C. 414, 420, 76 S.E. 222, 224 (1912))). The Law Firm Defendants' assertion is also undermined by the Record, including, for example, Attorney Roberts's deposition testimony in which not only did he testify he was not acting as Porter's attorney in filing the Guilford County Protests but was also not acting as Porter's "attorney in fact."

¶ 42      Indeed, the Law Firm Defendants make no argument they were mere couriers, process servers, private investigators employed by the protestors, or paralegals engaged to prepare legal filings, expert witnesses or any other type of "agent" of Porter and Agovino in this case. To the contrary, the Record here reflects in drafting and disseminating election protests in counties throughout North Carolina— including the Guilford and Brunswick County Protests in this case—the Law Firm Defendants were actually acting in their capacity as counsel to the Defense Fund, leaving the individual protestors to initiate and prosecute the actual protest proceedings pro se. In that capacity, the Law Firm Defendants were not participating in the election protests when they prepared the allegedly defamatory statements in

this case and aided in recruiting individuals to actually prosecute those protests.[4]

¶ 43        Thus, the statements attributed to the Law Firm Defendants were not made by the Law Firm Defendants in the course of a quasi-judicial proceeding and are not entitled to the protection of the absolute privilege against defamation suits. *See R. H. Bouligny, Inc. v. United Steelworkers of Am., AFL-CIO*, 270 N.C. 160, 171, 154 S.E.2d 344, 354 (1967) ("The privilege belongs to the occasion. It does not follow the speaker or publisher into other surroundings and circumstances. The judge, legislator or administrative official, when speaking or writing apart from and independent of the functions of his office, is liable for slanderous or libelous statements upon the same principles applicable to other individuals."). Therefore, the trial court did not err in denying Summary Judgment for the Law Firm Defendants and in granting partial Summary Judgment for Plaintiffs on the defense of absolute privilege.

---

[4] The Law Firm Defendants also argue that, if they are not deemed participants in the election protest, this necessarily defeats Plaintiffs' libel claims against them because then they cannot be deemed to have "published" the allegedly defamatory statements contained in the protests. We do not address this contention. Rather, we simply conclude, assuming the evidence reflects the Law Firm Defendants made defamatory statements about Plaintiffs and caused those statements to be published to third parties, the Law Firm Defendants are not entitled to the protection of absolute privilege because they were not making and disseminating these statements in the course of their participation in an election protest proceeding.

### C. *The Defense Fund*

In its briefing to this Court,[5] the Defense Fund argues persuasively for the application of absolute privilege to Porter but offers no independent basis for the application of absolute privilege to itself. The Defense Fund makes no argument that it was a party, witness, potential witness, or acting in any representative capacity in the course of the election protest proceeding or any other person or entity to which the absolute privilege has previously been applied by our Courts. Moreover, the Defense Fund does not argue it was participating in the election protest proceeding.

Indeed, the Record here reflects the Defense Fund expressly made the decision not to take part in the election protest proceedings. Instead, the Defense Fund authorized the Law Firm Defendants to prepare the election protests containing false and allegedly defamatory accusations of voter fraud against Plaintiffs, use those allegations to recruit individuals like Porter and Agovino, and convince them to adopt those accusations and file protests based on those false statements. Thus, because the Defense Fund was not participating in the election protest proceeding and, indeed, makes no argument the allegedly defamatory statements attributed to it were made by the Defense Fund in the due course of the election protest proceedings, the Defense Fund is not entitled to the absolute privilege defense in this case. Therefore,

---

[5] The Defense Fund did not appear at oral argument.

the trial court did not err in denying Summary Judgment for the Defense Fund and granting partial Summary Judgment for Plaintiffs on the defense of absolute privilege.

## **Conclusion**

Accordingly, for the foregoing reasons, we affirm the trial court's Summary Judgment Order, in part, to the extent it denied Summary Judgment for the Law Firm Defendants and the Defense Fund on the defense of absolute privilege and granted Summary Judgment for the Plaintiffs against those Defendants on the defense of absolute privilege. We reverse the portion of the trial court's Summary Judgment Order to the extent it denied Porter Summary Judgment on the defense of absolute privilege and granted Summary Judgment for the Plaintiffs against Porter as to his absolute immunity defense. We remand the matter to the trial court with instructions to enter judgment for Porter consistent with this opinion and to permit the parties to pursue further proceedings in this case.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

Judges ARROWOOD and CARPENTER concur.